RECORD NUMBER: 13-4598

# United States Court of Appeals

### *for the*

# Fourth Circuit

**UNITED STATES OF AMERICA,**

*Appellee,*

– v. –

**ANTONIO LAMAR WATKINS,**

*Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA AT ANDERSON**

# OPENING BRIEF OF APPELLANT

JONATHAN M. MILLING
MILLING LAW FIRM, LLC
**1614 Taylor Street
Suite C
Columbia, SC 29201
(803) 451-7700**

*Counsel for Appellant*

# TABLE OF CONENTS

Table of Authorities ........................................................................................ ii

Statement of Subject Matter and Appellate Jurisdiction ................................ 1

Issue Presented For Review .......................................................................... 1

Statement of the Case.................................................................................... 1

Statement of the Facts ................................................................................... 2

Summary of the Argument............................................................................. 9

   I.  The District Court Erred In Finding Watkins' Fourth Amendment
      Rights Were Not Violated .................................................................... 9

Standard of Review ....................................................................................... 9

Argument....................................................................................................... 10

   I.  The District Court Erred In Denying Watkins' Motion To
      Suppress ............................................................................................ 10

        a.    Watkins Was Illegally Seized When Young Initially
              Approached Him .................................................................... 11

        b.    Young Had No Reasonable Articulable Suspicion That
              Watkins Was Engaged In Criminal Activity............................ 15

        c.    The District Court Fails To Distinguish *United States v.
              Black.* ...................................................................................... 18

Conclusion .................................................................................................... 20

Statement Regarding Oral Argument ............................................................ 21

Certificate of Compliance

Certificate of Service

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*California v. Hodari D.,*
    499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) ................... 11

*Florida v. Bostic*,
    501 U.S. 429 (1991)................................................................... 12, 20

*Illinois v. Wardlaw*,
    528 U.S. 119 (2000)........................................................................ 17

*Michigan v. Chesternut*,
    486 U.S. 567 (1988)................................................................... 12, 20

*Terry v. Ohio*,
    392 U.S. 1 (1968)........................................................................... 10

*United States v. Black*,
    707 F.3d 531 (4th Cir. 2013) ..........................................*passim*

*United States v. Burgess*,
    684 F.3d 445 (4th Cir. 2012) .......................................................... 10

*United States v. Edwards*,
    666 F.3d 877 (4th Cir. 2011) .......................................................... 10

*United States v. Gray,*
    883 F.2d 320 (4th Cir. 1989) .......................................................... 11

*United States v. Jones*,
    678 F.3d 293 (4th Cir. 2012) .................................................... 14, 18

*United States v. Lattimore,*
    87 F.3d 647 (4th Cir.1996) .......................................................... 11

*United States v. McBride*,
    676 F.3d 385 (4th Cir. 2012) .......................................................... 10

*United States v. Mendenhall,*
    446 U.S. 544 (1980)..................................................... 11, 14

*United States v. Watson,*
    703 F.3d 684 (4th Cir. 2013) ................................. 10, 11, 15

*United States v. Weaver,*
    282 F.3d 302 (4th Cir. 2002) ............................................. 12

## Rules, Statutes, and Other Authorities

18 U.S.C. § 922(g)(1)........................................................... 1

18 U.S.C. § 924(a)(2)........................................................... 1

18 U.S.C. § 924(c)(1)(A) ...................................................... 1

18 U.S.C. § 924(e) ............................................................... 1

21 U.S.C. § 841(a)(1)........................................................ 1, 2

21 U.S.C. § 841(b)(1)(D)................................................... 1, 2

28 U.S.C. § 1291 ................................................................. 1

U.S. Constitution, Fourth Amendment ....................... 6, 10, 15, 18

## STATEMENT OF SUBJECT MATTER AND
## APPELLATE JURISDICTION

This is an appeal from a conviction under sections 922(g)(1), 924(a)(2), and 924(e) of title 18 of the United States Code, and sections 841(a)(1) and 841(b)(1)(D) of title 21.  A jury found Antonio Lamar Watkins guilty of each of these offenses after a two-day trial conducted on April 24 and 25, 2013.  Watkins was sentenced by the District Court on August 8, 2013 to 123 months incarceration and judgment was entered the next day.  The Notice of Appeal was timely filed on August 15, 2013.

Jurisdiction in the Court of Appeals is authorized pursuant to 28 U.S.C. § 1291.

## ISSUE PRESENTED FOR REVIEW

I.    WHETHER THE DISTRICT COURT ERRED IN FINDING THE STOP AND SEIZURE OF MR. WATKINS DID NOT VIOLATE THE FOURTH AMENDMENT?

## STATEMENT OF THE CASE

The Government charged Antonio Lamar Watkins ("Watkins") with three counts: (1) knowingly possessing a firearm and ammunition after having been convicted of a crime punishable by imprisonment for a term exceeding one year in violation of sections 922(g)(1), 924(a)(2), and 924(e) of title 18 of the United States Code; (2) knowingly possessing a firearm in furtherance of a drug trafficking crime in violation of section 924(c)(1)(A) of title 18 of the United

1

States Code; and (3) knowingly and unlawfully possessing with intent to distribute marijuana in violation of sections 841(a)(1) and 841(b)(1)(D) of title 21 of the United States Code.  A jury trial was conducted over a two day period from April 24 to April 25 of 2013.  At the end of the trial, the jury convicted Watkins on all three counts.  Subsequently, the District Court sentenced Watkins to 123 months imprisonment.  For the reasons set forth herein, the District Court's denial of Watkins' motion to suppress should be reversed, and his convictions vacated.

## STATEMENT OF THE FACTS

The facts, as presented during the suppression hearing and in the Presentence Report ("PSR"), taken in the light most favorable to the Government are as follows:

Watkins charges stem from an encounter he had with Roosevelt Young ("Young"), a narcotics investigator for the Edgefield County Sheriff's Office, on November 18, 2011.  Before Young encountered Watkins, Young received a tip provided from a known informant that another individual, Blake Clark ("Clark"), was selling crack cocaine in an area near Railroad Avenue in the town of Johnston. (JA p.34, ll. 2-24).  Clark was an individual known to Young.  In response to the tip, Young notified Chief Aston of the Johnston Police Department, who responded to the area.  (JA p. 35, ll.22-25).

Young subsequently arrived in an unmarked pickup truck. Upon approach, Young observed Chief Aston talking to two or three individuals. (JA p. 36, ll. 17-20). Young testified that in approaching the area, he saw also a "black male walking along the road" between 15 and 30 yards from where Chief Aston detained the other individuals. (JA p. 36, ll. 24-25; p. 41, ll. 18-20 (describing 20-30 yards); p. 66, ll. 15-19 (describing 15-20 yards)). In noticing Watkins, Young made the decision to detain and question Watkins because he wasn't familiar with him. (JA p. 58, ll. 21-23). Young, notably, did not have an opportunity to "surveil Mr. Watkins at all or Chief Aston talking to Blake before [he] drove up behind Watkins." (JA p. 56, ll. 15-18). Young did not observe Watkins standing near Clark, the subject of the tip. (JA p. 58, ll. 11-13).

In seeing Watkins walking down the roadway, there was nothing "unusual" about his appearance that prompted Young's decision to detain him. (JA p. 58, ll. 19-23). Young testified that the only thing unusual was that he didn't recognize Watkins; "he was an out of towner." (JA p. 58, ll. 19-23). Watkins was wearing "baggy pants, maybe a skull hat;" otherwise loose fitting clothing. (JA p. 58, l. 24 through p. 59, l. 2). Nothing, however, indicated any sort of a bulge or conduct that would have drawn Young's attention. (JA p. 58, l. 24 through p. 59, l. 3).

Upon making this decision to stop Watkins, despite there being nothing "unusual" about Watkins, Young pulled off the roadway "within five or six yards"

3

of Watkins, beeping the horn, and "immediately jump[ing] out and show[ing] him [his] badge and ask[ing] for his identification card." (JA, p. 37, ll. 17-19; p. 55, l. 6 through p.56, l. 14). In response to this abrupt conduct by Young, Watkins immediately stopped and complied with Young's demand for identification. (JA p. 57, ll. 1-5). During this encounter, Young got as close as a "couple inches from him when I was talking to him." (JA p.60, ll. 1-5) Young asked for Watkins' identification card and "call[ed] the information in," "[ran] his name." (JA p. 39, ll. 11-13). No evidence was presented that any negative report came from Young so doing. Despite receiving no negative response to Watkins' information being called in, Young did not return Watkins' identification card during the encounter, and it wasn't until Watkins was in jail that Young placed the identification card with his other personal property. (JA p. 67, ll. 8-11).

As Watkins was retrieving his identification from his wallet, Young testified that he could "smell an aroma of marijuana coming from him." (JA p. 38, ll. 5-6). He then asked Watkins if he had any drugs in his possession, to which he responded negatively. (JA p. 38, ll. 6-8). Despite the negative response, Young further inquired of Watkins whether he had anything else on him that Young needed to know about. (JA, p. 38, ll. 11-15). According to Young, Watkins also responded in the negative, but noted that Watkins "dropped his head." (JA p.38, ll. 11-15). "[B]ecause [he] just knew it was something there" Young asked a third

4

question seeking to illicit an incriminating response from Watkins - whether he had a gun, to which Watkins finally relented: "yes."  (JA p. 38, ll. 15-18).  At that point, Young formally detained Watkins and retrieved the gun and patted him down.  (JA p. 40, ll. 6-9; p.42, ll. 3-9).  During the pat down, Young found four small baggies containing a green, leafy substance which field tested positive for marijuana, some scales and a cigar box. (JA p. 42, ll. 13-17).  The total weight of marijuana was 2.8 grams. (JA p. 164, ¶ 11).

With the small quantity of marijuana found on Watkins' person, Young acknowledged that this did not create the "aroma" or marijuana Young professes he smelled and which he claims gave rise to further questioning of Watkins. (JA p. 60, ll. 9-12).  Rather, Young suggests that the "aroma" he smelled on the side of the road, out in the open, was that of smoked marijuana, a belief Young indicates was corroborated by a subsequent statement by Watkins. (JA p. 60, ll. 11-17).

A Federal Grand Jury originally indicted Watkins on April 10, 2012 based upon the aforementioned incident and charged Watkins with one count of felon in possession of a firearm and one count of possession of marijuana.  On July 24, 2012, a Superseding Indictment was returned by the Grand Jury adding one count of possession a firearm during the commission of a drug trafficking offense, and one count of possession with intent to distribute marijuana.

On October 30, 2012, counsel for Watkins moved to suppress all evidence seized from Watkins as fruits of a stop that violated Watkins' Fourth Amendment Rights. (JA p. 21-22). Not surprisingly, the Government responded in opposition on October 31, 2012. (JA p. 23-28). A hearing on this issue was held on March 22, 2013. (JA p. 29-150). At the hearing, the Court heard testimony from Young, Chief Aston, Sheriff's Deputy Warren Miller, and Watkins. After receiving the testimony and arguments from counsel, the Court denied Watkins motion. In so ruling, the Court noted that Young received a tip that "criminal activity, in particular, drug activity, was afoot and taking place in an area of Johnston, South Carolina…." (JA p. 141, ll. 15-19). The Court goes on to indicate that Young, upon arriving at the described location, saw the police chief "engaged with several individuals and saw Watkins within several yards of proximity to that activity walking away." (JA p. 142, ll. 1-4).

The District Court then outlines, contrary to the evidence presented during the hearing, that Young "testified that he noticed [Watkins] was wearing baggy clothes and knew something was there." (JA p. 142, ll. 5-7). Mention is also made to Young noting "puffy," "[a]nd I think the term he used was puffy. But it was something like puffy, if it wasn't puffy. Which gives some credibility to Sergeant Young's testimony that he, quote, knew something was there, end quote. Or words

to that effect." (JA p. 142, ll. 10-14).  The Court was mistaken in this regard as no

such testimony was presented.

 With the foregoing inaccurate recall of the testimony, the District Court

begins to recite the decision:

> This conduct and appearance, coupled with the other circumstances surrounding this incident, to include that you had one officer who was engaged with several individuals nearby, and the other circumstances I have mentioned and that was testified to today, in my view provide Sergeant Young with reasonable suspicion to stop and investigate.
>
> I find that Officer Young's testimony to be credible for purposes of this hearing.  And I find that the circumstances that confronted him on the date in question provided an adequate basis for him to stop the defendant and investigate further at the point under Terry v. Ohio and related cases thereunder.
>
> Sergeant Young, according to his testimony, upon engaging the defendant in conversation and initiating his investigation, noticed an odor of marijuana, or as he described it, an aroma of marijuana emanating from the person of the defendant.  At that point it's my understanding that no search had taken place.  And I believe there is sufficient law that when a person by his own conduct and actions exposes his conduct to the public, the Fourth Amendment is not implicated.
>
> Sergeant Young is a 16-year veteran of the sheriff's department and has worked as a narcotics investigator for 12 years.  And as such, no doubt, is familiar with the odor or aroma of marijuana.  By being in a public area with an aroma of marijuana, the defendant exposed his conduct, in essence, to the public.  And I believe there is law in this circuit that when an officer smells marijuana, upon a lawful stop, he then has probable cause to at least continue his investigation but also conduct a search.

(JA p. 142, l. 15 through p. 143, l. 21).

The Court then addresses certain admissions made by Watkins during the hearing which do not go to Young's decision to stop and question Watkins, before addressing *United States v. Black*, as cited by the defense.

> Now, we're all familiar with *US v. Black*. But I think circumstances are present in this case which distinguish this situation from that in the *Black* case. As noted in the Fourth Circuit's opinion in *Black*, which lists various criteria that needs to be reviewed by the Court, in that case there was a collective show of authority by uniformed police officers and their marked police vehicles.
>
> We did not have that situation here where you basically had two officers, one of whom was engaged with a group and in essence outnumbered, and Officer Young, who was in an unmarked truck. In *US v. Black*, there were four uniformed officers, a number that quickly increased to six and then seven. Two of the officers were performing perimeter duties ensuring that no other individuals interrupted the police interaction and preventing the men from leaving the vicinity.
>
> And then also in *US v. Black*, there was one officer who had frisked one individual, was frisking another individual, which the court noted was a reliable indicator that the officer would proceed to frisk the other men and that they were not free to leave. I don't think we had that here. I don't know that there was any testimony that the chief was over there with the other men searching them or frisking them.
>
> So I don't know that we even get to that point in the analysis here. But if there was some question about an immediate seizure of Mr. Watkins by Sergeant Young, I think the circumstances here are much different than were present in the situation described by *US v. Black*.

(JA p. 144, l. 12 through p. 145, l. 17)

The motion to suppress was denied.

Watkins proceeded to trial on April 24-25, 2013, with the fruits of the aforementioned search being admitted. Watkins was convicted of all counts. (JA p. 151).

After a Presentence Interview, the PSR was prepared for Watkins. Watkins Offense Level for Counts One and Three was found to be a Level 22. (JA p. 172, ¶ 55). The PSR also noted the five (5) year mandatory consecutive sentence for Count Two. (JA p. 172, ¶ 56). With a Criminal History Category of III, Watkins' Guideline range of imprisonment was 111 to 123 months incarceration. (JA p. 176, ¶ 76). Watkins was sentenced within this range to 123 months incarceration on August 8, 2013. (JA p. 11, entries 136, 137). Judgment was entered to this effect on August 9, 2013. (JA p. 152-156). Watkins timely filed a Notice of Appeal on August 15, 2013. (JA p. 157). For the reasons set forth herein, the District Court erred in refusing to find a violation of Watkins' Fourth Amendment rights, and this decision should be reversed, and his convictions be vacated.

## SUMMARY OF THE ARGUMENT

**I.    The District Court erred in finding Watkins' Fourth Amendment rights were not violated.**

## STANDARD OF REVIEW

A District Court's factual findings in denying a motion to suppress are reviewed for clear error, and the legal conclusions are reviewed de novo. *United*

*States v. Watson*, 703 F.3d 684, 689 (4th Cir. 2013)(*citing United States v. Burgess*, 684 F.3d 445, 452 (4th Cir. 2012); *United States v. Edwards*, 666 F.3d 877, 882 (4th Cir. 2011)).   In reviewing a denial, the evidence is viewed in the light most favorable to the Government. *See id.* (*citing United States v. McBride*, 676 F.3d 385, 391 (4th Cir. 2012)).

## ARGUMENT

## I. THE DISTRICT COURT ERRED IN DENYING WATKINS' MOTION TO SUPPRESS.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. Const. amend. IV; *United States v. Black*, 707 F.3d 531, 537 (4th Cir. 2013).   While not all interactions between law enforcement and citizens implicates the Fourth Amendment, "it is clearly established that an investigatory detention of a citizen by an officer must be supported by reasonable articulable suspicion that the individual is engaged in criminal activity." *Id.* (*citing Terry v. Ohio*, 392 U.S. 1, 21 (1968)). Although this objective justification is not required for brief encounters with law enforcement (*see id.*), because Young sought to investigate Watkins, justification was required.   None existed.

### a. Watkins was illegally seized when Young initially approached him.

"A seizure warranting Fourth Amendment protection occurs when in view of the totality of the circumstances, a reasonable person would not feel free to leave or otherwise to terminate an encounter with police." *United States v. Watson*, 703 F.3d 684, 689 (4th Cir. 2013)(*citing United States v. Lattimore,* 87 F.3d 647, 653 (4th Cir.1996). "As a general rule, a seizure requires either the use of physical force or, absent the use of such force, a submission to an officer's assertion of authority." *Id.* (*citing California v. Hodari D.,* 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)).  "Specific factors to consider in determining whether a reasonable person would feel free to leave include: (i) the number of police officers present at the scene; (ii) whether the police officers were in uniform; (iii) whether the police officers displayed their weapons; (iv) whether they touched the defendant or made any attempt to physically block his departure or restrain his movement; (v) the use of language or tone of voice indicating that compliance with the officer's request might be compelled; (vi) whether the officers informed the defendant that they suspected him of illegal activity rather than treating the encounter as 'routine' in nature; and (vii) whether, if the officer requested from the defendant ... some form of official identification, the officer promptly returned it." *Black*, 707 F.3d at 537-38 (*citing United States v. Mendenhall,* 446 U.S. 544, 554 (1980); *United States v. Gray,* 883 F.2d 320, 322–23 (4th Cir. 1989)).  Although

11

not dispositive, "the retention of a citizen's identification or other personal property or effects is highly *material* under the totality of the circumstances analysis." *See Black*, 707 F.3d at 538 (*citing United States v. Weaver,* 282 F.3d 302, 310 4th Cir. 2002)(emphasis added in *Black*)). "[T]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *See Florida v. Bostic*, 501 U.S. 429, 437 (1991)(*quoting Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)).

Viewed in the foregoing context, it is clear that Watkins was seized at the point Young initially stopped him. While it does not appear from the record that Young used physical force in seizing Watkins, it is clear that Watkins submitted to Young's assertion of authority, and that a reasonable person in Watkins' position would not have felt free to disregard Young. Prior to Young's approach, when Chief Aston arrived on the scene, it was apparent that Watkins, and others, had no interest in interacting with law enforcement. According to Chief Aston, "I just knew that [Watkins] and some other ones didn't want to be around what was going on [questioning of Clark]." (JA p. 77, ll. 21-24). Watkins walked away when Chief Aston called for Clark, clearly demonstrating a desire to avoid law enforcement, not engage law enforcement. (JA p. 78, ll. 6-7). While Chief Aston was in an unmarked car and wearing a golf shirt with BDU pants (JA p. 76, l. 16

12

through p. 77, l. 5), "[Watkins] knew he was a police officer because the way he commanded [Clark]." (JA p. 93, ll. 13-15). Thus, it is apparent from the outset that (1) Watkins could glean from Chief Aston's conduct and directives to Clark that he was a law enforcement officer, and (2) Watkins had no interest in voluntarily, or consensually interacting with law enforcement.

Shortly after intentionally avoiding interaction with Chief Aston, Young arrives. While Young had received information about Clark selling drugs in the area, he did not observe Watkins interact with Clark. (JA p. 58, ll. 11-13). Likewise, Young had no information about Watkins being engaged in any criminal activity. Young also did not know if Chief Aston had already spoken with Watkins. (JA p. 56, ll. 15-18). Despite the foregoing, Young made the decision to stop Watkins, a "black male walking along the road" (JA p. 36, ll. 24-25) because he didn't recognize him. (JA p. 58, ll. 19-23). While such "Gestapo tactics" may be permitted in a "police state," the Fourth Amendment does not permit such conduct in this Country.

Despite having no further justification for interfering with Watkins' otherwise peaceful evening, Young then drove his vehicle off the roadway, honked his horn at Watkins to stop him, "immediately jump[ing] out and show[ing] him [his] badge and ask[ing] for his identification card." (JA p. 37, ll. 17-19; p. 55, l.6 through p. 56, l.14). Young then got within a "couple inches" of Watkins while

13

questioning him. (JA p. 60, ll. 4-5). Such abrupt and invasive conduct is hardly the kind of peaceable or routine interaction one would expect to be permitted by the Fourth Amendment absent further justification. *See United States v. Jones*, 678 F.3d 293, 300 (4th Cir. 2012)(A traditional hallmark of a police-citizen consensual encounter is the seemingly routine approach of the police officer).

While this encounter only involved one officer, this was the second officer Watkins had encountered within a very short time. Thus, it was clear to Watkins that he would not be permitted on his way without some contact with law enforcement.

Young's vehicle was unmarked, and Young, himself, was in plain clothes. While under *Mendenhall* and *Black* these facts could mitigate against seizure, when an officer in an unmarked vehicle stops abruptly, sounding his horn to stop a citizen, "jumping" out, flashing a badge and demanding identification, such conduct is even more alarming than a uniformed officer walking down the roadway and encountering a citizen. In fact, under these circumstances, given Young's sudden actions, it was clear that this was no routine encounter, and that Watkins, and only Watkins, was the target of Young. It was further readily apparent that non-compliance with Young's directives was not an option.

Young did not touch Watkins, true, but his other conduct in driving off the roadway in close proximity to Watkins, honking his horn, jumping out of the

14

vehicle, alerted all present that Watkins had to stop for law enforcement.  Closing within inches of Watkins clearly signifies that Watkins was not free to go.  That Young did not specifically advise Watkins, initially, that he suspected criminal activity is of no moment, as undercover officers do not customarily drive off the roadway toward civilians and jump out at them, flash a badge, and demand identification.  Young's interest in Watkins was apparent, although his justification lacking.

It is clear that, from the totality of these circumstances, it would be apparent to a reasonable person in Watkins' position that he or she was not free to leave or terminate Young's contact. *See Watson*, 703 F.3d at 689.  This was especially true once Young took possession of Watkins' identification card; which he never returned. *See Black*, 707 F.3d at 538.  Watkins was seized, which implicates the Fourth Amendment.  The Constitutionality of this seizure will hinge upon Young's justification, if any.   As previously noted, Young had no justification, and this seizure violated Watkins' Fourth Amendment rights.

### b. Young had no reasonable articulable suspicion that Watkins was engaged in criminal activity.

When law enforcement initiates an investigatory detention of a citizen, the Fourth Amendment is violated unless that officer has a "reasonable articulable suspicion that the individual is engaged in criminal activity." *See Black*, 707 F.3d at 537.  The totality of the circumstances clearly outline that during the contact

15

between Young and Watkins, Watkins was not free to leave. Thus, to find the detention lawful, Young had to be able to articulate his suspicions regarding what criminal activity Watkins was believed to be committing.

Despite the District Court's finding to the contrary, Young testified only that he saw a "black male" that he didn't recognize. (JA p. 36, ll. 24-25; p. 58, ll. 19-23). There was nothing "unusual" about Watkins. (JA p. 58, ll. 19-23), and Young did not observe any type of a bulge that drew Young's attention. (JA p. 58, l. 24 through p. 59, l. 3). The District Court's announcement that Young described something "puffy" and that he "knew that something was there" is clearly erroneous. No testimony was presented that anything on Watkins was "puffy." Further, the District Court's reliance on Young's statement that he "knew something was there" is misplaced. This testimony came from Young regarding a belief *after* Watkins had been stopped, *after* Young held Watkins identification card, *after* Watkins denied possession of drugs, and *after* Watkins denied having anything unlawful on his person. It *did not* justify the initial seizure of Watkins; nothing does.

The District Court goes on to suggest that Watkins' conduct (in walking down the road) and appearance (which wasn't unusual), coupled with other circumstances (of law enforcement questioning another individual who was the subject of an actual tip), provided Young with reasonable suspicion (despite the

16

fact that Young failed to enunciate *any* suspicion, much less *reasonable* suspicion). The District Court erred. Interestingly, this Court in *Black* clearly outlined that the fact that a defendant is in an area where one would expect to see criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion. *See Black*, 707 F.3d at 542 (*citing Illinois v. Wardlaw*, 528 U.S. 119 (2000)). Unfortunately, this is all we have in the instant matter. The seizure was illegal and the District Court erred in holding otherwise.

Reliance on Young's testimony that he observed an "aroma" of marijuana likewise does not aid in establishing reasonable suspicion. Young *did not* observe any "aroma" of marijuana when he was driving down the road and observed Watkins walking. Young *did not* observe an "aroma" of marijuana when he made the decision to pull off the road, jump out of his truck, and demand identification from Watkins. Young *did not* observe an "aroma" of marijuana when he walked up to Watkins, badge in hand. In fact, it wasn't until Young was a mere "couple inches from [Watkins],"[1] after Watkins was removing his identification at Young's insistence that Young noticed the "aroma." (JA p. 60, ll. 1-5). Interestingly, Young acknowledges that the 2.8 grams of marijuana was *not* what was smelled. (JA p. 60, ll. 9-12). Even smelling this "aroma," however, does not support the initial

---

[1] As previously noted, coming within a "couple inches" of an individual on the side of the road would certainly support a reasonable belief that the individual was not free to leave and disregard law enforcement's advances.

seizure, when Young stopped to interrogate Watkins as Watkins walked down the road. The District Court simply glosses over the problems associated with the initial stop and seizure and moves straight to an inaccurate characterization of what an odor of marijuana may implicate in a Fourth Amendment analysis. As previously noted, we do not get to this discussion without a reasonable, articulable suspicion for the initial stop. None exists and the seizure violated Watkins' rights.

### c.  The District Court fails to distinguish *United States v. Black.*

The District Court's attempts to distinguish *United States v. Black* in hopes of saving the stop fail. Much thought is given to the number of uniformed officers in *Black*, and the few, plain clothes officers in the instant case. Such is not dispositive, however, as a totality of the circumstances must be evaluated. Although in plain clothes and an unmarked vehicle, the conduct of Young is clearly antagonistic and anything but routine. While the District Court merely notes the facts are distinguishable, no moment is given as to how these differences might impact the "totality" analysis. Looking to those factual differences reveals that Watkins seizure began well before the seizure in *Black.*

In *Black*, law enforcement approached a group of men who were stationary, so law enforcement did not "stop" the men, but rather only approached them. *See Black*, 707 F.3d at 535. Watkins, however, was already in motion, and his path and travel was intentionally obstructed by Young. *See e.g. Jones*, 678 F.3d at 300

(Noting that officer's actions in blocking Jones' vehicle "lacked the traditional hallmark of a police-citizen consensual encounter: the seemingly routine approach of the police officer").  The initial contact in *Black* was law enforcement walking up and being advised by a colleague of Black that he had a firearm. *See Black,* at 535.  With Watkins, the officer drives off the road in Watkins' direction, honking his horn, jumping out of the vehicle, flashing a badge, and seeking identification.  In *Black*, upon securing the aforementioned firearm, Black volunteered his ID, which the officer pinned to his uniform. *See id.* at 535-36.  When Watkins was producing his identification card, after Young's insistence, Young was within a "couple inches."  This Court in *Black* concluded that upon pinning Black's identification to the officer's uniform, a seizure occurred. *See id.* at 538. At this point, law enforcement presence was apparent, fanning the area, and frisking the men upon seizure of the firearm.

In the instant situation, law enforcement presence was also apparent, as Chief Aston had already encountered Watkins while questioning Clark.  Watkins left that area only to find Young pulling off the road towards him, jumping out of the car and honking the horn.  Lest we forget, while in plain clothes, Young flashed his badge as he was jumping out of the car and instructing Watkins.  While Black volunteered his identification, Young insisted Watkins provide it and got

within inches of Watkins as he was attempting to produce it. Law enforcement maintained the identification in both situations.

While the facts are different, the District Court's failure to delve into the actual analysis was erroneous. Had such an inquiry been made, it would have been clear that Watkins was seized, just as Black was, without justification. The District Court's factual conclusions were clearly erroneous, and this Court's independent review of the law reveals that, as with *Black*, Watkins' stop by law enforcement was more than a mere police-citizen encounter – it was a seizure. Young had no articulable suspicion of Watkins at that point, reasonable or otherwise. Watkins was seized in violation of his Constitutional Rights. The District Court erred in refusing to suppress the evidence seized as "fruit of the poisonous tree."

## CONCLUSION

As our Supreme Court has said "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *See Florida v. Bostic*, 501 U.S. at 437 (*quoting Michigan v. Chesternut*, 486 U.S. at 569). For the reasons set forth herein, a reasonable person in Watkins' position would not have felt this ability. This Court should reverse the decision of the District Court.

20

## STATEMENT REGARDING ORAL ARGUMENT

Counsel for the Appellant would respectfully request oral argument in person in this matter.

Respectfully submitted,

By: /s/ Jonathan M. Milling
     *Counsel*

Jonathan M. Milling, Esq.
MILLING LAW FIRM, LLC
1614 Taylor Street, Suite C
Columbia, South Carolina 29201
T: (803) 451-7700
F: (804) 451-7701
jmm@millinglaw.net

*Counsel for Appellant*

21

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 13-4598          **Caption:** United States v. Antonio Watkins

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[✓]    this brief contains _____4,980_____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[ ]    this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[✓]    this brief has been prepared in a proportionally spaced typeface using
Microsoft Word 2010 _____ [*identify word processing program*] in
Times New Roman, 14pt _____ [*identify font size and type style*]; **or**

[ ]    this brief has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Jonathan M. Milling _____

Attorney for Antonio Watkins _____

Dated: 12/27/2013 _____

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 27, 2013, I electronically filed the

Opening Brief and Joint Appendix with the Clerk of Court using the

CM/ECF System, which will send notice of such filing to the following

registered CM/ECF users:


CARRIE FISHER SHERARD
OFFICE OF THE U.S. ATTORNEY
55 Beattie Place
One Liberty Square
Suite 700
Greenville, SC 29601
(864) 282-2100

<u>*/s/ Catherine B. Simpson*</u>
Counsel Press LLC
1011 East Main Street
Suite LL-50
Richmond, Virginia 23219
(804) 648-3664


Filing and service were performed by direction of counsel